<u>Execution Copy</u>

# LICENSE AGREEMENT

by and between

# L. C. LICENSING, INC.

and

# MODERN SHOE COMPANY LLC

# Table of Contents

| **Section** | | **Page** |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Grant of License | 3 |
| 3. | Term; Events of Default; Termination | 5 |
| 4. | Distribution | 7 |
| 5. | Organization | 9 |
| 6. | Standards and Quality; Merchandise Approvals | 9 |
| 7. | Advertising and Marketing; Showroom and Trade Shows | 13 |
| 8. | Guaranteed Minimum Royalties | 17 |
| 9. | Sales Royalty | 17 |
| 10. | Intentionally Omitted | 17 |
| 11. | Statements and Financial Information and Covenants | 17 |
| 12. | Effect of Expiration or Termination | 20 |
| 13. | Non-Compete | 23 |
| 14. | Intellectual Property Matters | 24 |
| 15. | Confidentiality | 25 |
| 16. | Equitable Relief | 26 |
| 17. | Indemnity; Insurance | 26 |
| 18. | Representations and Warranties | 27 |
| 19. | Brokers | 28 |
| 20. | Notices | 29 |
| 21. | Miscellaneous | 29 |
| 22. | Licensor's Approval or Consent | 31 |

# LICENSE AGREEMENT

**LICENSE AGREEMENT** ("Agreement"), dated as of the Effective Date, by and between L.C. LICENSING, INC., a Delaware corporation having an office at c/o Liz Claiborne, Inc., 1441 Broadway, New York, NY 10018 ("Licensor"), and Modern Shoe Company LLC, a Delaware limited liability company  with its principal place of business located at 101 Sprague Street, Hyde Park, MA 02136 ("Licensee").

**WHEREAS**, Licensor holds exclusive rights to the use and exploitation of the Licensed Mark(s) in connection with the manufacture and sale of Merchandise within the Territory (as such terms are defined below).

**WHEREAS**, Licensee has experience and expertise in developing, manufacturing, promoting, selling and distributing Merchandise, and is desirous of associating its products with the Licensed Mark(s) so as to obtain the benefit of the goodwill associated therewith.

**WHEREAS**, Licensee desires to have the exclusive right and license, and Licensor desires to grant such right and license, to use the Licensed Mark(s) as applied to the manufacture, promotion, sale and distribution of Merchandise within the Territory, all on the terms and subject to the conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises, the mutual representations, warranties and promises set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby  acknowledged, Licensor and Licensee agree as follows:

1.      <u>Definitions.</u>      The following definitions shall be applicable throughout this Agreement:

     1.1      The terms *"Exclusive Territory,"* *"Non-Exclusive Territory"*, and *"Territory"* have the meanings set forth in Schedule 1.1.

     1.2      The term "Licensed Mark(s)" means the trademark(s) listed on Schedule 1.2, with such logomark and in the type style and typeface approved in advance by Licensor.

     1.3      The term *"Merchandise"* means and is limited to those items listed on Schedule 1.3, and does not include any other items whatsoever.

     1.4      The term *"Licensed Merchandise"* means Merchandise intended to be sold or promoted in connection with a Licensed Mark; the term *"Approved Licensed Merchandise"* means Licensed Merchandise approved by Licensor in accordance with the provisions hereof.   The term *"Category"* means each of the categories of Approved License Merchandise set forth in Schedule 1.3.

     1.5      The term *"Line Opening Date"* is the date of the initial trade introduction for each line of Approved Licensed Merchandise for each major market.   The number and timing of seasonal Line Opening Dates for Approved Licensed Merchandise are listed on Schedule 1.5.

     1.6      The term *"Sample"* means any and all models, or actual samples or prototypes, of Licensed Merchandise, except that the terms *"Initial Sample"* and *"Final Sample"* have the meanings set forth in Article 6 hereof.

1.7    An "affiliate" of any Person means and includes any Person, who controls, is controlled by or is under common control with such Person. The term "control" (including the correlative meanings of "controlled by" and under "common control with") means the power, directly or indirectly, to effectively direct or cause the direction of the management and policies of any Person. The term "Person" means any natural person, corporation, association, business, government, governmental agency, firm, partnership or other entity, whether acting in an individual, fiduciary or other capacity.

1.8    The term "Effective Date" has the meaning set forth in Schedule 1.8; the term "First Contract Year" means the period commencing on the Effective Date and terminating on the date set forth in Schedule 1.8.

1.9·    The term "Contract Year" means the First Contract Year, and the twelve (12) month period commencing on each January 1 thereafter during the Initial Term and any Renewal Term.

1.10    The term "Business Plan" means such annual business plan(s) relating to Licensee's business hereunder, prepared by Licensee in such format, and containing such detailed data, information, sales and marketing plans, budgets and projections, as Licensor may from time to time reasonably request, including the information set forth in Schedule 1.10.

1.11    The term "Packaging" means all packaging and packaging materials for Approved Licensed Merchandise, including boxes, containers, wrappings, labels, tags and any and all other receptacles and materials, including any artwork and/or graphics embodied therein.

1.12    As used in this Agreement, the terms "Gross Sales" and "Net Sales" shall have the meanings set forth in Schedule 1.12.

1.13    The terms "Off-Price Sales," "Off-Price Sales Cap," and "Full Price Sales Threshold" have the meanings set forth in Schedule 1.13.

1.14    The term "LCI Standards" means the standards, reputation and established prestige and goodwill connected with the Licensed Mark(s) and the names of Licensor and its parent, Liz Claiborne, Inc. (LCI), including the design content, spirit, quality, style, fit, price point and value which apparel products bearing the Licensed Marks(s)have come to represent in the minds of the trade and the public, and Licensee shall reflect throughout its operations hereunder the standards embodied in the businesses owned and operated by Licensor and LCI and the Standards of Engagement, a copy of the current form of such standards is attached as Schedule 1.14 (such standards as they may from time to time be reasonably amended or modified, the "Standards of Engagement").

1.15    The term "Approved Customers" means, collectively, Approved Full Price Customers, Approved Distributors (as such terms are defined in Section 4.1) and Approved Off Price Customers (as defined in Section 4.2).

1.16    The term "Make-Up" means Licensed Merchandise that is patterned after an approved in-line style of Licensed Merchandise but varies slightly in components from such in-line style and is sold only to Approved Off Price Customers.

2

2.      **Grant of License.**

2.1      **(a)**      Subject to the terms and conditions of this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts, an exclusive license solely to use the Licensed Mark(s) in the Territory as a trademark(s) in connection with the manufacture, advertising, merchandising, promotion, sale and distribution of Approved Licensed Merchandise to Approved Customers.  Licensee shall use the Licensed Mark(s) only in the form approved in advance in writing by Licensor for use by Licensee and only in connection with the manufacture, advertising, merchandising, promotion, sale and distribution to Approved Customers of Approved Licensed Merchandise subject to the terms of this Agreement.  No Licensed Mark shall be accompanied by any word, mark or symbol, or include a trademark in any type style or typeface other than that so set forth. Licensor has the right to change the required typeface and type style of a Licensed Mark in its discretion from time to time; provided that it gives Licensee written notice of such change at least six (6) months prior to the date that Licensee is required to start using such changed typeface or type style.  No license is granted hereunder for the use of the Licensed Mark(s) for any purpose other than as specifically set forth in this Section 2.1.

**(b)**      **(i)**      Licensor retains and reserves any and all rights to use and exploit, and to grant to any other Person the right to use and exploit, the Licensed Mark(s), and any designs, names or other items supplied by Licensor hereunder in connection with any and all products and services, other than Merchandise bearing the Licensed Mark(s), and to use and exploit any other trademarks in connection with Merchandise.

**(ii)**      Licensee understands and agrees that Licensor may grant to third parties the right and license to manufacture and sell Licensed Merchandise outside of the Territory, subject to any right of first negotiation on additional countries set forth in Section 2.6 hereof.  In such event, Licensee agrees, upon Licensor's request, to negotiate in good faith with such third party licensees to provide them with design information necessary for the manufacture and sale of Licensed Merchandise upon terms mutually agreed upon by the parties; provided however that if such negotiations fail to produce a mutually acceptable agreement, Licensee shall be under no obligation to provide to such third party licensees its design information, which shall remain the proprietary and confidential information of Licensee.

**(c)**      Licensee acknowledges that, at the date hereof, Licensor sells products bearing the Licensed Mark(s) and such products have an established reputation for high standards and quality. Licensee acknowledges that, in order to preserve the goodwill attached to the Licensed Mark(s), Approved Licensed Merchandise should be sold at prices and terms reflecting the prestigious nature of the Licensed Mark(s) consistent with other products bearing such Licensed Mark(s); it being understood, however, that Licensor is not empowered to fix or regulate the prices at which Approved Licensed Merchandise is to be sold, either at the wholesale or retail level.

2.2      Licensee will not use the Licensed Mark(s) on or in connection with Merchandise or any other product manufactured from designs neither provided nor approved by Licensor or on Merchandise or any other product distributed by any person or entity, including Licensee, as premiums, promotions, give-aways or fund-raisers except with Licensor's express prior approval.  Licensee will not manufacture, or cause the manufacture of, any products under any trademark other than the Licensed Marks bearing designs or of a styling the same as the designs or styling of any Licensed Merchandise or substantially similar to the unique or distinctive designs or styling of any Licensed Merchandise.

2.3      **(a)**      The license granted herein is strictly personal to Licensee.  Neither this

Agreement nor any of the rights granted to or obligations undertaken by Licensee hereunder may be transferred, assigned, pledged, sold, mortgaged, sublicensed or otherwise hypothecated or disposed of, either directly or indirectly, in whole or in part, by operation of law or otherwise (collectively, *"transfer"*), to any Person without the prior written approval of Licensor, which may be withheld in Licensor's sole discretion; any attempted transfer shall be null, void, and of no force or effect.

**(b)**    Notwithstanding the foregoing, Licensee may engage subcontractors and suppliers to produce Approved Licensed Merchandise hereunder; provided, however, that (i) prior to any subcontractor or supplier undertaking any work under this Agreement, Licensee must notify such subcontractor or supplier in writing of the requirements and standards set forth herein including the products, quality and trademark protection standards, as well as the LCI Standards; and (ii) compliance with the terms and conditions of this Agreement will remain the sole and exclusive responsibility of Licensee, and Licensee will be responsible for the acts and omissions of all subcontractors and suppliers, and such acts and omissions will for purposes of this Agreement be deemed to be acts and omissions of Licensee, such that the supervision of production of Approved Licensed Merchandise will remain under the control and the responsibility of Licensee in accordance with the terms of this Agreement.   Licensee will supply Licensor within thirty (30) days of the date this Agreement is executed, and at any time during the Term upon the request of the Licensor, with a list of subcontractors and suppliers employed by Licensee in connection with its operations hereunder, and Licensee will complete the "Licensee/Factory Profile" attached as Schedule 2.3(b) for each subcontractor and supplier.  Licensee will promptly cease its relationship with any subcontractor or supplier in connection with its operations hereunder upon Licensor's reasonable request or if any such subcontractor or supplier fails to comply with the terms and conditions contained herein to be complied with by Licensee.  Licensee will, within thirty (30) days after Licensor's request, require subcontractors and suppliers to execute an agreement in a form acceptable to Licensor regarding quality control and any other matters as Licensor reasonably deems appropriate.

**(c)**    Furthermore, Licensee may engage distributors to distribute Approved Licensed Merchandise hereunder, only with the express prior written approval of Licensor, which may be withheld in its sole discretion (distributors so approved shall hereinafter be referred to as "Approved Distributors"); provided, however, that compliance with the terms and conditions of this Agreement will remain the sole and exclusive responsibility of Licensee, and Licensee will be responsible for the acts and omissions of all Approved Distributors, and such acts and omissions will for purposes of this Agreement be deemed to be acts and omissions of Licensee, such that the supervision of distribution of Approved Licensed Merchandise will remain under the control and the responsibility of Licensee in accordance with the terms of this Agreement.   Licensee will require all Approved Distributors to execute an agreement in a form acceptable to Licensor.  Sales to such Approved Distributors will be included as Net Sales.

**(d)**    Licensee will use commercially reasonable efforts to make the personnel and facilities of its distributors, suppliers and contractors available to Licensor for inspection and consultation during normal business hours.

**2.4**    Licensee will devote sufficient financial resources to its business and operations hereunder and will use its commercially reasonable efforts to develop and maintain a substantial, permanent and expanding business under this Agreement, and to sell a maximum quantity of Approved Licensed Merchandise consistent with the high standards and prestige associated with the Licensed Mark(s) and the terms of this Agreement.

**2.5**      In the event of any dispute between Licensee and any other licensee of Licensor in the Territory with respect to the products covered by their respective licenses, such dispute will be resolved in good faith by Licensor in its sole discretion.

**2.6**      Licensee shall have a right of first negotiation as set forth in Schedule 2.6.

**3.      Term; Events of Default and Termination.**

**3.1      (a)**      The term of this Agreement will commence as of the Effective Date and will continue through the date set forth on Schedule 3.1(a) (the *"Initial Term"*), unless renewed or sooner terminated as provided herein.

**(b)**      Subject to the provisions of this Article 3, provided that; (1) no event of default (as defined below) under this Agreement has occurred and is continuing; (2) no default (as defined below) under this Agreement then exists; (3) the amount of aggregate Net Sales of Approved Licensed Merchandise shall equal or exceed the amounts listed on Schedule 3.1(b) as the "Renewal Threshold", then the term of this Agreement may be renewed by Licensee, at its option, for additional renewal terms as set forth in Schedule 3.1(c) (the *"Renewal Term"*); provided that Licensee must notify Licensor in writing of its intention to renew by the date set forth in Schedule 3.1(d), and the parties must agree in good faith on the advertising and marketing expenditures applicable to each renewal term no later than the dates set forth in Schedule 3.1(e).

**3.2**      The parties agree that any announcement to the public or trade of the termination or expiration of this Agreement will be made only at a time, and by a joint statement mutually agreed upon by the parties.

**3.3**      Each of the following constitutes, an event of default under this Agreement:

**(a)**      If Licensee fails to pay any funds owing to Licensor pursuant to this Agreement as and when due, provided that with respect to the first such failure by Licensee, Licensor will not be entitled to call a default under this Section 3.3(a) until it gives Licensee notice thereof and Licensee fails to cure such default within five (5) days of such notice;

**(b)**      If Licensee or Licensor institutes proceedings to be adjudicated a voluntary bankrupt or insolvent, or consents to the filing of a bankruptcy proceeding against it, or files a petition or answer seeking reorganization or arrangement under any bankruptcy act or any other similar applicable law of any country, or consents to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency for itself, or any of its property, or makes an assignment for the benefit of creditors, or is unable to pay its debts generally as they become due, or shall cease doing business as a going concern, or corporate action is taken by it in furtherance of any of the foregoing purposes; or

**(c)**      If an order, judgment or decree of a court having jurisdiction is entered adjudicating Licensee, a bankrupt or insolvent, or approving, as properly filed, a petition seeking reorganization of Licensee, or of all or a substantial part of its properties or assets under any bankruptcy act or other similar applicable law, as from time to time amended, or appointing a receiver, trustee or liquidator of Licensee or Licensor, and such order, judgment or decree remains in force, undischarged and unstayed for a period of thirty (30) days, or a judgment or lien for the payment of money in excess of $250,000 is rendered or entered against it and the same remains undischarged or unbonded for a period of thirty (30) days, or any writ or warrant or attachment shall be issued or levied against a substantial part of its property and the same is not released, vacated or bonded within thirty (30) days after issue or levy; or

**(d)**      If Licensee defaults, subject to applicable cure or waiver provisions, on any obligation in excess of $250,000 which is secured by a security interest in Licensed Merchandise; or

**(e)**      If Licensee for any reason discontinues the sale of Approved Licensed Merchandise or any substantial portion of its business operations, or shall liquidate or dissolve except that Licensee may discontinue the sale of some Approved Licensed Merchandise from time to time in its reasonable business judgment and such discontinuance shall not constitute an event of default; or

**(f)**      If Licensee without the prior written approval of Licensor (which approval shall not be unreasonably withheld or delayed): (i) sells (regardless of how designated) all or substantially all of its assets, (ii) merges or consolidates with or into another corporation or entity, or (iii) if there is a change in control of Licensee, in each case whether in a single transaction or as the aggregate result of a series of transactions, and whether the transaction or transactions involve an affiliated or unaffiliated Person or entity; or

**(g)**      If Licensee's Net Sales of Approved Licensed Merchandise fail to equal or exceed in any two consecutive Contract Years the amounts set forth in Schedule 3.3(g) as the Minimum Net Sales amount for such Contract Years; or

**(h)**      If Licensee fails, in any Contract Year to pay or expend the amounts required to be paid or expended under any provision of Article 7; or

**(i)**      If Off-Price Sales in any Contract Year during the Initial Term or during any Renewal Term are equal to or greater than the Off-Price Sales Cap set forth in Schedule 1.13, or if Net Sales to Full Price Customers are less than the Full Price Sales Threshold set forth in Schedule 1.13; or

**(j)**      If Licensee fails in any Contract Year to ship at least ninety percent (90%) of the orders received by it for Licensed Merchandise; or

**(k)**      If Licensee fails to comply with any of the quality requirements set forth herein; or

**(l)**      If Licensee conducts its business hereunder in a manner which causes Licensor to send Licensee two or more notices of a default under this Section 3.3 in any consecutive 12 month period; or

**(m)**      If Licensee has not begun the bona fide sale of Approved Licensed Merchandise by the time indicated in the Initial Business Plan approved by Licensor, unless a delay in such sales has been approved in advance in writing by Licensor; or

**(n)**      If Licensee breaches Section 11.10 hereof; or

**(o)**      Intentionally omitted.

**(p)**      If any representation or warranty of either party contained herein is or becomes false or misleading in any material respect, or if either party fails to perform or observe any term, condition, agreement or covenant in this Agreement on its part to be performed or observed, other than as provided in Paragraphs (a) through (o) of this Section 3.3, and such default is not remedied within thirty (30) days after written notice thereof from the non-defaulting party, unless such default is curable but is not capable of being cured through the defaulting party's diligent and continuous effort within such thirty (30) day period, and such party immediately commences to cure such default, and thereafter applies its diligent and continuous

best efforts to cure such default, and does in fact cure such default within sixty (60) days of the initial notice of default.

3.4    As used in this Agreement, the term *"default"* shall mean any condition, event or state of facts which, after notice or lapse of time, or both, would be an event of default.

3.5    If any event of default occurs and is continuing, the non-defaulting party may, by written notice to the defaulting party, immediately terminate this Agreement; provided that in the event of default under Sections 3.3(b), (c), (d), (e) or (f) , this Agreement will terminate automatically.

3.6    (a)    Notwithstanding anything to the contrary herein, if Licensee defaults, subject to applicable cure or waiver provisions, on any obligation which is secured by a security interest in any Licensed Merchandise, automatically and simultaneously therewith Licensee no longer shall have the right to sell or otherwise transfer Licensed Merchandise or otherwise use the Licensed Mark(s) until (i) it notifies Licensor of the occurrence of such default on any such obligation; and (ii) Licensor notifies it that Licensor has elected to waive its right under Section 3.3(d) to terminate this Agreement by reason thereof.

(b)    No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, sheriff or any other officer of the court or official charged with taking over custody of Licensee's assets or business may continue this Agreement or exploit or in any way use the Licensed Mark(s) if this Agreement terminates as a result of as default under Sections 3.3(b) or (c).

(c)    In the event that, pursuant to the Bankruptcy Code or any amendment or successor thereto (the *"Code"*), a trustee in bankruptcy of Licensee or Licensee, as debtor, is permitted to assume this Agreement and does so and, thereafter, desires to assign this Agreement to a third party, which assignment satisfies the requirements of the Code, then the trustee or Licensee, as the case may be, must notify Licensor of same in writing. Said notice must set forth the name and address of the proposed assignee, the proposed consideration for the assignment and all other relevant details thereof. The giving of such notice will be deemed to constitute the grant to Licensor of an option to have this Agreement assigned to it or to its designee for such consideration, or its equivalent in money, and upon such terms as are specified in the notice. The aforesaid option may be exercised only by written notice given to the trustee or Licensee, as the case may be, by Licensor within fifteen (15) days after Licensor's receipt of the notice from such party, or within such shorter period as may be deemed appropriate by the court in the bankruptcy proceeding. If Licensor fails to give its notice to such party within the said exercise period, such party may complete the assignment referred to in its notice, but only if such assignment is to the entity named in such notice and for the consideration and upon the terms specified therein. Nothing contained herein shall be deemed to preclude or impose any rights which Licensor may have as a creditor in any bankruptcy proceeding.

4.  **Distribution.**

4.1    (a)    The parties acknowledge and agree it is the intention that Approved Licensed Merchandise be sold only to retailers and distributors whose location, merchandising and overall operations are consistent with the high quality of products sold under the Licensed Mark(s) and the reputation, image and prestige of the Licensor and LCI's name and of the Licensed Mark(s). Licensee may sell first quality, in-season items of Approved Licensed Merchandise only to retailers operating in the Territory approved in advance by Licensor (which approval shall not be unreasonably withheld or delayed) ("Approved Full Price Customers") and to Approved Distributors as set forth below and in Section 2.3(c) hereof. Licensor agrees that the customers listed on Schedule 4 are deemed to be Approved Full Price Customers as of the date

hereof. Such Schedule may be modified or supplemented by Licensor in its reasonable determination from time to time on notice to Licensee.  Except as explicitly set forth above in this Section 4.1, Licensee shall not accept orders for first quality, in-season Licensed Merchandise from any other customers without Licensor's prior express written consent (which shall not be unreasonably withheld or delayed), and Licensee shall consistently monitor its customers to assure compliance with the terms of this Agreement.

      **(b)**      Licensee may sell first quality in season items of Approved Licensed Merchandise to Approved Distributors for resale to Approved Customers.  Licensee shall not accept orders for first quality, in season Licensed Merchandise from any other distributors without Licensor's prior written consent, which may be withheld in its sole discretion.  Licensor agrees that the distributors listed on Schedule 4 are Approved Distributors as of the date hereof.

      **4.2**      Licensee may sell distressed, end-of-season closeouts or Make-Ups of Licensed Merchandise through off-price customers operating in the Territory approved in advance in writing by Licensor (which approval shall not be unreasonably withheld or delayed) ("Approved Off-Price Customers").  Licensor agrees that the off-price customers listed on Schedule 4 are Approved Off-Price Customers as of the date hereof for sales of distressed, end-of-season close-outs and Make-Ups of Approved Licensed Merchandise; such Schedule may be modified or supplemented by Licensor in its reasonable determination from time to time on notice to Licensee. Except as explicitly set forth above in this Section 4.2, Licensee will not accept orders distressed, end-of-season closeouts or Make-Ups of Licensed Merchandise from any other customers without Licensor's prior express written consent (which shall not be unreasonably withheld or delayed), and Licensee shall consistently monitor the customers to assure compliance with the terms of this Agreement.  Licensor and its parent LCI and their respective affiliates and licensees have a right of first refusal to purchase any or all of such distressed or end-of-season Licensed Merchandise prior to it being offered for sale to Approved Off-Price Customers. Licensee will provide Licensor with prompt written notice of the proposed terms of any offer to sell to third parties such Approved Merchandise, and Licensor and LCI and their respective affiliates and licensees will have ten (10) business days from its receipt of such notice to exercise its right of first refusal by providing written notice to Licensee of its desire to purchase such Approved Licensed Merchandise. Such right shall apply to each price point at which Licensee offers such Licensed Merchandise. All seconds and irregulars of Licensed Merchandise offered for sale shall be marked as such. For purposes of clarity, Licensor's right of first refusal described above in this Section 4.2 does not extend to Make-Ups of Approved Licensed Merchandise.

      **4.3**      Licensee will not make sales of Licensed Merchandise to any Person (i) which it knows, or reasonably should have known, intends to sell such Licensed Merchandise outside of the channels of distribution described in Section 4.1 or 4.2 above or to a Person other than the ultimate customer, or (ii) which is not an Approved Customer.  Licensee will not export or permit to be distributed, either directly or indirectly, any Licensed Merchandise to any Person located outside of, or who Licensee knows, or reasonably should have known, intends to resell such Licensed Merchandise outside of, the Territory.  Licensee will cease selling Licensed Merchandise to any store, distributor or other customer, including previously approved customers, and will use all commercially reasonable efforts to remove any Licensed Merchandise held by such store, distributor or other customer, upon the reasonable request of Licensor or in the event that any such store, distributor or other customer is not selling Licensed Merchandise in accordance with the terms of this Agreement.

      **4.4**      **(a)**      Licensee will sell to Licensor and its affiliates such items of Licensed Merchandise as may be ordered by Licensor and its affiliates from time to time solely for resale direct to consumers, including on the internet, through catalogs and in retail and outlet stores wholly or partially owned

and operated by Licensor or LCI or any of their affiliates, as evidenced by timely placed, non cancelable purchase orders. All such purchases shall be on terms no less favorable than those made available to Licensee's comparable customers, including a high priority delivery schedule. The price to be paid by Licensor and its affiliates for such orders of Licensed Merchandise, and the terms applicable to such orders, will be agreed upon at arm's length in good faith by the parties, provided however that the price to be paid shall be at least twenty percent (20%) off of list price.

   **(b)**   Licensee shall sell Licensed Merchandise to international retail and distribution partners of Licensor and LCI at a price and upon terms to be agreed upon at arm's length in good faith by the parties.

   **4.5**.   Licensee will only offer for sale, advertise, promote or sell Approved Licensed Merchandise at wholesale to Approved Customers as permitted under Sections 4.1 and 4.2, and will not offer for sale, advertise, promote or sell any Licensed Merchandise to or through any other customers, channels or outlets, including the internet, television, catalogs or specialty retail or outlet stores. Notwithstanding anything to the contrary contained herein, Licensee may sell Approved Licensed Merchandise to Approved Full Price Customers for sale on e-commerce websites owned and operating by such Approved Full Price Customers and through any such customer's catalog business.

   **4.6**   Licensee will manufacture for sale to Licensor and its affiliates for sale through direct-to-consumer businesses wholly or partially owned or operated by Licensor or its affiliates such items of Merchandise under any Licensed Mark requested by Licensor or its affiliate from time to time. ("Made-to-Order Product"). The price to be paid for such Made-to-Order Product by Licensor, and the terms applicable to orders of such product, shall be as may be agreed upon at arm's length in good faith by the parties.

   **4.7**   No Licensed Merchandise may be sold on consignment.

  **5.**   **Organization.**   Licensee will at all times employ such competent and qualified personnel as are necessary to fulfill its obligations under this Agreement. Without limiting the foregoing, Licensee will employ individual(s) in the position(s) set forth in Schedule 5, each with an appropriate staff and each of who will work exclusively for the business licensed hereunder. The hiring of such persons is subject to the prior approval of Licensor, which approval will not be unreasonably withheld or delayed, and such persons will at all times be acceptable to Licensor in its reasonable commercial judgment. Licensee will make all of its personnel available by appointment during normal business hours for consultation with representatives of Licensor.

  **6.**   **Standards and Quality; Merchandise Approvals.**

   **6.1**   **(a)**   Licensee acknowledges that the Licensed Mark(s) and name of Licensor and LCI have established prestige and goodwill, are well recognized in the mind of the trade and the public, and have a reputation for high standards and quality. Licensee will maintain the LCI Standards in all of its operations under this Agreement. Licensee and its affiliates, subcontractors, suppliers and distributors will comply with the Standards of Engagement.

   **(b)**   All items of Licensed Merchandise will reflect the LCI Standards and the general lifestyle themes and concepts as expressed by Licensor to Licensee from time to time. Included within each collection will be (i) a number of items of Licensed Merchandise which specifically coordinate and are capable of being cross-merchandised with specific products bearing the Licensed Mark(s), as Licensor and Licensee agree, and (ii) an appropriate mix of fashion and basic items which will include a reasonable number

of styles, which styles will reflect diverse fabrications and styling, mutually agreed upon by the parties in advance for the collection to be competitive and complete.

(c)    Licensee will use all technology and techniques available to Licensee for embodiment within Licensed Merchandise to the extent such use is commercially reasonable. Licensee will provide Licensor with a description of Licensee's research and development capacities, processes, new product constructions, designs and materials and the most up-to-date information (whether or not proprietary). Such description must be of sufficient detail to allow Licensor to make an informed decision about viability for use in connection with Licensed Merchandise and must be provided to Licensor as soon as reasonably practical in the course of development, but in any event, in sufficient time for Licensor and Licensee to be able to incorporate at least simultaneously with any commercial use in the Territory by Licensee or any affiliate for itself or any third party, such research and development into Approved Licensed Merchandise in a manner consistent with high quality products, so that Licensor is assured of having the option of having any new or improved product, technology or technique available to Licensee embodied in Licensed Merchandise. Such information will be deemed to be confidential information under Section 15. Upon termination of this Agreement, Licensee will provide Licensor access to, and the right to use, any technical information necessary for Licensor to continue the manufacture of any item of Licensed Merchandise.

6.2    (a)    Each collection of Merchandise shall be developed substantially in accordance with a product development calendar mutually agreed to by both parties and attached hereto as Schedule 6.2 (the "Product Development Calendar"). With respect to each collection of Merchandise, Licensee shall present to Licensor, for its approval, concepts for the collection and for the Products proposed to be included in the collection, including inspirations, ideas and concepts for fabrications, materials, color palettes and designs (collectively, "Merchandise Concepts"), and design components for the Products proposed to be included in the collection, including fabrications and materials, trims, hardware, sketches, graphic artwork and the "color story" (collectively, "Design Concepts"). Thereupon, Licensee, shall develop from the approved Merchandise Concepts and Design Concepts, and any other items and information submitted or approved by Licensor for such collection, a fashion forward and innovative collection of Merchandise, with the contents and workmanship of all Merchandise to be of the highest quality for the Market Segment consistent both with the quality of comparable, competitive Products of other leading, high-end, designer and fashion firms and/or their licensees and with the design sensibilities represented by other products bearing the Licensed Mark. Also, Licensee shall continually source out new Design Components and new specifications for Design Concepts, and shall submit them to Licensor for its consideration, in its sole discretion, for use in connection with Merchandise.

(b)    At any time or from time to time, Licensor may, in its sole discretion by notice to Licensee, advise Licensee that Licensor desires a particular item or items of Merchandise to be manufactured and sold as Approved Licensed Merchandise hereunder, and Licensee will use all commercially reasonable efforts to incorporate any such item into the line of Licensed Merchandise.

(c)    Promptly after Licensor's receipt of Merchandise Concepts and Design Concepts, appropriate representatives of Licensor and Licensee shall meet at such place in the New York City metropolitan area as the parties designate, to confer thereon and on any of Licensor's proposed designs. The parties will make such modifications thereon as may be required to meet Licensor's initial approval with respect thereto.

10

(d)      Licensee will, as specified in the Product Development Calendar, prepare and present to Licensor, or its designee, at such place as Licensor may in its discretion designate, at Licensee's sole cost and expense, an initial sample (*"Initial Sample"*) in respect of each Design Concept and Merchandise Concept approved by Licensor under Section 6.2(a).  All Initial Samples are subject to Licensor's approval. Licensor and Licensee will make their appropriate representatives available to meet, at such place in the New York City metropolitan area as the parties designate, promptly after Licensor's receipt of Initial Samples, to confer with respect to Licensee's presentation of Initial Samples, and Licensee will make such modifications therein as may be required to meet Licensor's initial approval with respect thereto.   Revised Samples will be submitted for Licensor's approval reasonably in advance of the Line Opening Date.

(e)      As used herein *"Final Sample"* means and includes a Sample of an item of Licensed Merchandise for which an Initial Sample or Revised Sample has been approved by Licensor (or a Sample provided by Licensor to Licensee under the provisions of Section 6.3 hereof), which shall embody all of the specifications (the *"Specifications"*), including the workmanship, quality, design, dimensions, styling, detail, material, colors and the like, as are to be used in the actual commercial production of each item of Approved Licensed Merchandise to be based on said Final Sample.

(f)      Licensor's approval of the Final Samples for all items of Licensed Merchandise will be evidenced by a written list, duly signed by a representative of Licensor, setting forth those Samples which have been approved for production.  Samples so approved will be deemed *"Final Samples"* in respect of such collection.  Approval of any and all Samples as Final Samples is in the sole discretion of Licensor.  Licensor will respond as promptly as reasonably practicable (and in any case within twenty (20) days from submission) to any written request from Licensee for approval of a Sample; any such request must be addressed to the attention of such person and at such address as Licensor may, from time to time, designate (any change thereon to be effective only in accordance with Section 20 hereof).  Any such approval will continue in effect indefinitely thereafter, provided that any such approval may be withdrawn by Licensor upon not less than three (3) months prior written notice to Licensee.

(g)      In the event that Licensor rejects a particular Sample or Samples, Licensor will notify Licensee of its reasons for rejection and provide Licensee with suggestions for modifying the rejected Sample(s).  Licensee will, as promptly as practicable, correct said Sample(s), resubmit said Sample(s) to Licensor and seek Licensor's approval under the same terms and conditions as set forth with respect to the first submission of such Samples.

6.3      Licensor may provide Licensee with a Sample in respect of any item or items of Licensed Merchandise.  Such Sample will, for all purposes, be deemed a Final Sample hereunder unless Licensee and Licensor mutually agree to the contrary within twenty (20) days after the date of Licensee's receipt thereof.

6.4      Licensee will introduce an agreed upon number of styles at each market.   Licensee will present at each major market a complete collection of fashion and basic items which shall include a reasonable number of styles mutually agreed upon in order for the collection to be competitive and complete.

6.5      Licensee will present for sale, through showings of each collection to the trade and otherwise, all items of Approved Licensed Merchandise in respect of which Final Samples have been approved by Licensor, in accordance with the terms hereof.  Licensee will use all commercially reasonable efforts to promote the sale and distribution of all items of Licensed Merchandise in respect of which Final Samples have been approved by Licensor, in accordance with the terms hereof.

6.6     The Approved Licensed Merchandise manufactured and sold by Licensee will strictly adhere, in all respects, including with respect to the Specifications therefore, to the Final Samples therefore approved by Licensor.

6.7     All Licensed Merchandise manufactured by or on behalf of Licensee will be suitable for its intended use and will not be designed or produced so as to be inherently dangerous.  Without limiting the foregoing, *(i)* no Licensed Merchandise shall contain or be packaged in any injurious, poisonous, deleterious or toxic substance or material, *(ii)* no Licensed Merchandise will be adulterated or mislabeled, and *(iii)* all Licensed Merchandise and all manufacturing methods used to produce the same will meet or exceed all applicable industry and governmental standards established in respect of safety.  Licensee will assure that all laws, statutes, rules, regulations, and industrial or governmental standards and requirements, now in force or hereafter adopted, which may be applicable to the manufacture, advertising, merchandising, promotion, importation, sale and distribution of Licensed Merchandise, will be strictly observed and complied with, notwithstanding the fact that Licensor may have expressly or implicitly approved any item or conduct with respect thereto.  Licensee will at its own cost do such testing of Licensed Merchandise as may be required under applicable law or as is customary and standard in the industry, including quality testing.  Licensee will supply Licensor, promptly after request from time to time, with *(i)* results of any testing of Licensed Merchandise performed by Licensee, *(ii)* copies of all certifications, if any, provided by all manufacturers and importers of Merchandise, and *(iii)* a certification, in form and substance reasonably satisfactory to Licensor, from a recognized independent testing laboratory to the effect that Samples for such items of Merchandise intended for sale and distribution as Licensed Merchandise comply with the foregoing provisions of this paragraph.  Costs and expenses relating to any testing expressly required by Licensor will be shared equally by Licensor and Licensee; provided, however, that if any such test results or if the results of any other testing performed by Licensee indicates that any tested Merchandise does not comply with the provisions of this paragraph, Licensee will *(A)* forthwith pay all costs and expenses incurred in connection with such testing, and *(B)* pay all expenses of any additional testing which Licensor reasonably requests during the two (2) year period following the date on which Licensor received the results of the test indicating said sub-standard performance.  Without limiting the foregoing, all Licensed Merchandise produced hereunder must comply with all reasonable standard of quality guidelines formulated by Licensor from time to time and with all applicable statutes, rules and regulations.  Without limiting the foregoing, Licensee must complete and submit to Licensor the Licensee Procedures Checklist attached as Schedule 6.7 within thirty (30) days of the end of each Contract Year.

6.8     Licensee will, from time to time upon request of Licensor, furnish Licensor, free of charge, with two (2) sets of samples of each current item of Licensed Merchandise then being or intended to be sold and distributed hereunder.

6.9     Licensor has the continuing right of approval of all items of Licensed Merchandise, including the Specifications therefor, to ensure that all Licensed Merchandise manufactured, sold or distributed is (i) in compliance with the Final Samples therefore; (ii) of the highest quality at its price points; (iii) consistent with the LCI Standards, and (iv) otherwise in accordance with the terms of this Agreement.  In connection with the production of Licensed Merchandise, Licensee will use only such materials as Licensor will have previously approved.  Licensed Merchandise manufactured and sold by Licensee shall strictly adhere in all respects to the Specifications, the LCI Standards and the production standards approved by Licensor from time to time.

6.10     In the event that any Licensed Merchandise is not, in the reasonable good faith judgment of Licensor, being manufactured or sold in accordance with the provisions hereof, Licensor may

notify Licensee thereof in writing, and Licensee will, as promptly as practicable, take such action with respect thereto as Licensor deems appropriate including, if reasonably requested, the immediate recall of such items of Merchandise from Licensee's customers and ultimate consumers for inspection and/or destruction.

      6.11    Licensor and its representatives have the right, upon reasonable advance notice to Licensee and during normal business hours, to inspect at Licensor's expense all facilities utilized by Licensee, its distributors, subcontractors, suppliers, agents and representatives in connection with the manufacture, sale, storage or distribution of Licensed Merchandise pursuant hereto and to examine Licensed Merchandise in process of manufacture or storage and when offered for sale within Licensee's operations. Licensee hereby consents to Licensor's examination of Licensed Merchandise held by its customers for resale. To the extent such manufacturing and selling facilities are not owned or controlled by Licensee, Licensee will use its commercially reasonable efforts to permit the representatives of Licensor to make such inspections. Licensee will use its commercially reasonable efforts and will take all steps reasonably requested by Licensor to prevent or avoid any misuse of the Licensed Mark(s) by any of its distributors, contractors, suppliers or customers.

      6.12    Licensee agrees that, from time to time, there may be a reasonable basis for Licensor's representatives to visit Licensee's facilities or factories, and Licensee agrees to reimburse Licensor for Licensor's expenses incurred with respect to such travel. Licensee agrees that, from time to time, it may be appropriate for Licensor's representatives to attend one or more appropriate major trade shows and Licensee agrees to reimburse Licensor for Licensor's reasonable, pre-approved expenses incurred with respect to such travel.

      6.13    All Samples whether made by Licensee or under its authority, will be Licensor's property, and Licensee will surrender all Samples to Licensor immediately upon the expiration or termination of this Agreement or sooner if Licensor requests.

      6.14    Licensor acknowledges that Licensee employs quality standards for Licensed Merchandise manufactured by it and Licensor agrees that in designing and developing Licensed Merchandise, it will take such standards into account. However, in the event of a conflict between Licensor's design standards and requirements and Licensee's normal quality standards, Licensor's design standards and requirements will prevail.

      6.15    Licensee will reimburse Licensor for all reasonable, pre-approved costs associated with design/product development, including, but not limited to, purchase of design/prints from third parties and travel and hotel expenses associated therewith.

      6.16    It is specifically understood and agreed that all approvals under this Agreement by Licensor will be made only by the President of Licensor's Licensing Division or a designated alternate.

    7.     __Advertising and Marketing; Showroom and Trade Shows__

      7.1    Prior to the *"launch"* of the initial collection of Licensed Merchandise, and as soon as practical after the execution of this Agreement, Licensee will submit for Licensor's approval an introductory marketing plan stating anticipated sales volume, accounts, product positioning, advertising and promotional support and such other relevant information as Licensor may reasonably request. Further, in addition to the advertising described below, Licensor and Licensee will endeavor to agree upon the manner and media to be utilized in advertising and promoting and staging the launch; provided, however, that Licensor's decision is final.

**7.2** **(a)** In recognition of the importance of advertising in developing and projecting the image of the Licensed Mark(s) and in enhancing the sales of Approved Licensed Merchandise, Licensor will conduct a program for all products bearing the Licensed Mark(s)  (the *"Image Program"*).  Licensor will develop and control the creative components of all advertising and related promotional material (including all publicity, whether through media placement or *"events"*) to be used in the Image Program.  Licensor will determine the media to be used for advertisements and the advertising agency(ies) to be used and all national (including for purposes of this paragraph Licensor-placed regional and local) advertisements will be placed by Licensor.  The Image Program will include all of the activities undertaken by Licensor to develop and promote the Licensed Mark(s).

**(b)** In connection with the Image Program for the Licensed Mark(s), in each Contract Year, Licensee will pay to Licensor the amount set forth on Schedule 7.2 (the "Image Fund Payment") as a contribution towards the program.

**(c)** The Image Fund Payment will be used by Licensor for purposes of advertising and promoting the Licensed Mark(s) and Approved Licensed Merchandise.  However, if Licensor elects to do brand advertising on television, Licensor may apply up to one-half (½) of the Image Fund Payment for such purpose.

**(d)** The Image Fund Payment will be computed, invoiced, and payable as set forth in Schedule 7.2. The Image Fund Payment is in addition to any other monies payable hereunder and will not be credited against and/or recoupable from any amounts otherwise payable to Licensor hereunder.

**7.3** Licensee will prepare and present to Licensor an annual marketing program with respect to Licensed Merchandise for each Contract Year no later than December 1 of the preceding Contract Year. Such program will be subject to the approval of Licensor.   Appropriate representatives of Licensor and Licensee will meet, at such place in the New York City metropolitan area as the Licensor designates, to confer on such marketing program, and Licensee will make such changes therein as are necessary to obtain Licensor's approval thereof.

**7.4** **(a)** Licensee's marketing program for Licensed Merchandise will at all times adhere to the philosophy of Licensor, as from time to time expressed to Licensee.  Licensee will at all times maintain the prestige and goodwill of the Licensed Mark(s) and the names of Licensor and LCI.  Without limiting the foregoing, Licensee will not, without the express prior written consent of Licensor, sell or distribute any Licensed Merchandise in combination sales, as premiums or *"give-aways"*, or pursuant to other similar methods of merchandising (including *"gift-with-purchase"* and *"purchase-with-purchase"* programs), and will not sell or distribute any other item or product in connection with Licensed Merchandise (any such other items or products being herein referred to as *"Promotion Products"*).  In the event that Licensor consents to the sale or distribution of Promotion Products, such consent may provide that for purposes of determining Gross Sales (as defined below) hereunder for purposes of royalty calculations only, Promotion Products will be deemed Licensed Merchandise hereunder.

**(b)** Licensee will adhere to the LCI Standards in all of its trade advertising, promotional and business materials (including signs, phone listings, order forms, labels, boxes, receptacles, business cards, adornments, tags and letterhead), all collateral and promotional products and material, all visual merchandising materials of any kind, including in-store fixtures, and all Packaging for all items of Approved Licensed Merchandise, and will not employ or otherwise release any of same, including any advertisement or collateral support materials relating to any Approved Licensed Merchandise (such as, by way

of example but not by way of limitation, standard types of advertisements in the form of "*slicks*" or otherwise), unless and until Licensee has made a request for approval in writing, and Licensor has consented to same in writing, such approval to not be unreasonably withheld or delayed. Licensee will cause to appear on all Licensed Merchandise, and on all advertising and business materials and Packaging used in connection therewith, such legends, markings and notices as Licensor may from time to time require. Approval or disapproval of any proposed use of a Licensed Mark(s) shall be given by Licensor as promptly as reasonably practicable after receipt of Licensee's written request in connection therewith, but in all cases within twenty (20) business days after actual receipt by Licensor of Licensee's request; if neither approval nor disapproval has been given within such time, approval will be deemed to have not been given. Any such approval will continue in effect indefinitely thereafter, provided that any such approval may be withdrawn by Licensor upon not less than three (3) months' prior written notice to Licensee. Licensee must obtain prior express written approval for any use of the Licensed Mark(s) not expressly approved in advance by Licensor. Licensee will, at the request of Licensor, include in its advertising and on its business materials and all Packaging an indication of the relationship of the parties hereto in a form approved by Licensor. All right, title and interest in and to all advertising and promotional programs and material with respect to Approved Licensed Merchandise is and will remain the sole and exclusive property of Licensor, regardless of the origin of such programs and materials.

        **(c)**      **(i)**      In addition to the Image Fund Payment, Licensee will in each Contract Year expend on cooperative advertising, other marketing and collateral (including trade advertising) of Approved Licensed Merchandise not less than the amount set forth in Schedule 7.4(c). In no event shall the expenses incurred in connection with cooperative advertising be applied against the expenditures required under Section 7.2.

        **(ii)**      All cooperative advertising whereby Licensee provides a retailer a contribution toward the cost of an advertisement for Approved Licensed Merchandise, whether Licensee's contribution be in the form of an actual monetary contribution, credit or otherwise, will be subject to the prior approval of Licensor under the same terms and conditions as apply to advertising and promotional materials prepared by or to be used by Licensee pursuant to Section 7.4(b); provided, however, that in the event that Licensee is not as a matter of practice given an opportunity to review the cooperative advertising copy or format prior to publication due to time constraints, then Licensee will notify Licensor, in advance, of those retailers with whom it does cooperative Licensed Merchandise advertising and/or promotion, and Licensee or Licensor, at Licensor's sole election, shall notify the named retailer of the terms of this Agreement which pertain to the said advertising or promotional materials and advise that any cooperative Licensed Merchandise advertising or promotion must comply herewith. Licensee will suspend its cooperative advertising of Licensed Merchandise with any retailer to which Licensor objects or any retailer who fails to comply with the provisions of this Section 7.4.

        **(iii)**      All marketing and collateral is subject to the express prior written approval of Licensor. In no event will the expenses incurred in connection with marketing and collateral be applied against the expenditures required under Section 7.2.

        **(d)**      Licensee will furnish Licensor with an accounting on a semi-annual basis on June 30 and December 31 of each Contract Year, reconciling the amount actually spent by Licensee on all advertising and marketing, including cooperative advertising (broken down by customer), in-store fixturing and other marketing collateral compared with the budgeted amounts, which accounting shall be delivered to Licensor within forty-five (45) days of the relevant date.

7.5     In order to take advantage of certain expertise, experience and success of the advertising agency or agencies which then are responsible for handling advertisements for Licensor in the various countries in the Territory (collectively, including an *"in house"* agency or marketing/creative services department of Licensor (if applicable), the *"Agency"*) in projecting the image of the Licensed Mark(s), Licensee will utilize the Agency in connection with the development of the creative portion of any consumer and trade advertisements of Approved Licensed Merchandise (*"Trade Materials"*). Except in circumstances where pooling of advertising buys, in Licensor's determination, is practicable, the placement of such advertising will be the responsibility of Licensee, need not be committed through the Agency and may be placed through any other advertising agencies chosen by Licensee, but the schedule for such placement is subject to the prior approval of Licensor. Licensee will pay for any material and services supplied by the Agency, including (for materials and services provided by or through an *"in-house"* agency or marketing/creative services department) an Agency service fee which will not exceed ten (10%) percent of the Agency's direct costs thereof, in amounts mutually determined by Licensee and the Agency and approved by Licensee, in its reasonable business judgment, prior to commencement of the project. With respect to all financial arrangements between Licensee and any outside agency, Licensee will deal directly with the agency, without any involvement or responsibility on the part of Licensor. Notwithstanding anything to the contrary herein, payment made to the Agency for advertising materials and advertising fees during a Contract Year will be credited against the expenditures required under Section 7.4(c) for such Contract Year.   No other in-store fixturing, visual merchandising, collateral or marketing support material may be used by Licensee in connection with Approved Licensed Merchandise without Licensor's express prior written consent, which shall not be unreasonably withheld or delayed.

7.6     During each market period in each of Las Vegas and New York City, Licensee will, at its sole cost and expense, maintain, operate and staff a dedicated showroom area and/or booth, separate from Licensee's other operations within Licensee's showroom and/or booth, of Approved Licensed Merchandise bearing each Licensed Mark. The design of the showroom(s) and/or booth(s) are subject to Licensor's prior written approval and will be devoted solely to the presentation and sale of Approved Licensed Merchandise (each, a *"Showroom"*). The Showroom will be located at an agreed-upon location in each of Las Vegas and New York City subject to Licensor's prior written approval. Licensee will display and offer for sale to the trade in Licensee's Showroom all (and not less than all) current items of Approved Licensed Merchandise. Licensee will submit all design, architectural drawings and other material aspects of the showrooms, including but not limited to fixtures, furnishings, signage and any icons and visual merchandising bearing the Licensed Mark(s), to Licensor for its approval, which approval will not be unreasonably withheld or delayed. Licensee may retain Licensor's services to produce the design drawings for the Showroom(s), and in such event Licensee will pay Licensor's fee for such services. Such Showroom(s) will be constructed by Licensee in accordance with the drawings and materials approved by Licensor. Thereafter, each Showroom must be maintained, operated, staffed and decorated at all times in all respects in a first class manner so as to be consistent with and the prestige and goodwill of Licensor and the Licensed Mark(s) and Licensor's design aesthetic. Licensee will at all times maintain each Showroom in a safe, clean and attractive condition, and shall do such lighting, painting, decorating, embellishing, repairing and restoration as Licensor may from time to time reasonably require.

7.7     Licensee will arrange for a dedicated space in Licensee's booth or a booth (if such dedicated space in the Licensee's booth is not available) at such national and regional trade shows as Licensee and Licensor, from time to time, shall mutually deem appropriate, at which booth a Category or Categories of Approved Licensed Merchandise (and no other Merchandise) will be displayed as set forth herein, such booth to be staffed by sales personnel who shall have responsibility solely for the promotion and

sale of that Category of Approved Licensed Merchandise  The location and design of any such booth is subject to Licensor's prior written approval.  Notwithstanding the foregoing, there shall be no obligation for Licensee to maintain a booth at a trade show if it already maintains a Showroom at such trade show.

8.     **Guaranteed Minimum Royalties.**

      **8.1**     Licensee will pay to Licensor for each Contract Year a guaranteed minimum royalty as provided in Section 8.2 below as a non-refundable advance against Sales Royalties (defined below) payable to Licensor hereunder in respect of Net Sales made in the Territory for each Contract Year during the Initial Term and any Renewal Term.  No credit shall be permitted against the Guaranteed Minimum Royalties paid or payable in respect of any Contract Year on account of Guaranteed Minimum Royalties paid or Sales Royalties paid or payable in respect of any other Contract Year.  If the aggregate of all Guaranteed Minimum Royalties and Sales Royalties paid by Licensee to Licensor hereunder in respect of sales of Licensed Merchandise in respect of a Contract Year shall equal or exceed the Guaranteed Minimum Royalty for such Contract Year, then and in such event Licensee will not be obligated to make payment of any further installment of Guaranteed Minimum Royalty otherwise payable hereunder in respect of such Contract Year.

      **8.2**     **(a)**     The Guaranteed Minimum Royalty payable for each Contract Year will be as set forth in Schedule 8.

            **(b)**     The Guaranteed Minimum Royalties will be invoiced and due as set forth in Schedule 8.

9.     **Sales Royalty.**

      **9.1**     **(a)**     In consideration of the license granted hereunder the Licensee will pay to Licensor a sales royalty on all of Licensee's Net Sales of Approved Licensed Merchandise for each Contract Year as set forth in Schedule 9 (the *"Sales Royalty"*).

            **(b)**     The gross invoice price of any Approved Licensed Merchandise sold by Licensee to any affiliate of Licensee (other than distributors) is deemed, for the purposes of this Agreement, be deemed to be the higher of (i) the actual gross invoice price therefore; or (ii) Licensee's regular selling price for such Licensed Merchandise sold to unaffiliated parties for sale at retail, and will be deemed sold at the earlier of the invoice date or delivery date.  Sales to distributors which are affiliates of Licensee will not be deemed Net Sales hereunder; sales by such affiliated distributors will be included as Net Sales hereunder.

      **9.2**     The Sales Royalty shall be accounted for and paid as set forth in Schedule 9. Licensee shall submit the report more fully described in Section 11.1(b) contemporaneously with the Sales Royalty payment.  The Sales Royalty payable for any quarter will be less any amounts paid at the beginning of such quarter pursuant to Section 8.2(a).

10.     **Intentionally Deleted.**

11.     **Statements and Financial Information.**

      **11.1**     **(a)**     Licensee will prepare, and at all times maintain at its principal executive offices, true, correct and complete separate books of account and records reflecting all transactions and operations within the scope of this Agreement, in accordance with generally accepted accounting principles.

**(b)**     For each quarterly period ended the last day of March, June, September and December in each Contract Year, Licensee will prepare and furnish to Licensor: (i) a quarterly royalty statement (the "Quarterly Royalty Statement"); and (ii) a quarterly sales report (the "Quarterly Sales Report), each of which shall be in the format specified from time to time by Licensor and certified as accurate by a senior financial officer of Licensee, which reports will be furnished to Licensor within twenty (20) days after the end of each such period.  As of the date of this Agreement, Quarterly Royalty Statements should be provided in the format specified in Schedule 11.1.  The Quarterly Sales Report will provide, with respect to each Licensed Mark, the following information by month concerning the calculation of the amount payable for the period covered by the Quarterly Royalty Statement (the *"Reporting Period"*): (a) the gross sales of all Approved Licensed Merchandise shipped during the Reporting Period by Category, style, color and size; (b) the amount of any approved deductions from Gross Sales by Category, style, color and size; (c) the Net Sales by Category, style, color and size  for such period; (d) the amount of Sales Royalty earned hereunder on said Net Sales for the Reporting Period; (e) the total amount of the Sales Royalty earned in the current Contract Year (including Sales Royalty earned in the Reporting Period); and (f) the amount of Sales Royalty payable this Reporting Period after deduction from the amount shown in (e) of the amount of the Guaranteed Minimum Royalty and Sales Royalty actually paid in the current Contract Year.  The amount payable for the Reporting Period will be the aggregate of the amount calculated in accordance with the preceding sentence and the amount of the Image Fund Payment due hereunder for the Reporting Period.  In addition, each such statement will include Off-Price Sales by Category, style, color and size, export sales and sales by style, customer, and country and such other information as Licensor may reasonably request.  In addition, by February 15th of each Contract Year, Licensee will submit to Licensor a similar statement with respect to the preceding Contract Year.

**(c)**     Licensee will submit to Licensor within fifteen (15) days after the end of each month a report setting forth Gross Sales of Approved Licensed Merchandise for such month by Category and customer.

**11.2**     If the payment of any Guaranteed Minimum Royalties or Sales Royalties hereunder is delayed for any reason, interest will accrue on the unpaid principal amount of such payment at the prime rate (as defined) plus five (5%) percent (the *"Default Rate"*).  The *"prime rate"* shall be as published from time to time by The Chase Manhattan Bank, N.A. in New York City, adjusted each January 1 and July 1, to reflect the prime rate in effect at each such date, each such adjusted rate to apply for the six (6) months immediately following such adjustment.

**11.3**     Licensee's books and records of account, together with any relevant supporting materials, will be available for inspection and copying (at Licensor's expense) and audit by Licensor or its agents at all reasonable times, upon reasonable prior notice, for the duration of this Agreement and for four (4) years thereafter.  Any audit by Licensor will be made by Licensor at its own expense; provided, however, that if any examination by Licensor reveals an underpayment by Licensee in Sales Royalties payable to Licensor for any quarterly period, Licensee will forthwith pay any such deficiency, together with interest thereon from the original due date at the Default Rate; provided, further, that if such underpayment is in an amount equal to or greater than two (2%) percent of the amount originally paid by Licensee in respect of such period, Licensee will also pay all costs and expenses incurred by Licensor in connection with such examination; and if such underpayment is five (5%) percent or more of the amount originally paid by Licensee with respect to such period, such underpayment will constitute an event of default under Section 3.3(a) of this Agreement; and if two (2) such underpayments of Sales Royalties occur, the second of such underpayments will be an event of default under Section 3.3(a) without any opportunity to cure such default.

11.4     All payments required hereunder will be made in United States dollars by check or in immediately available funds by wire transfer to the account of Licensor in accordance with such instructions as Licensor may, from time to time, provide Licensee. In the event that any sale of Approved Licensed Merchandise is paid in a foreign currency, then, for the purpose of computing Net Sales, the amount of any such sale will be converted to United States dollars at the buying site rate for United States dollars published by The Chase Manhattan Bank, N.A. in New York City as in effect on the last business day of the period in respect of which the payment of Sales Royalties in respect of such sale is to be calculated.

11.5     Licensee will deliver to Licensor the items set forth in Schedule 11.5, Financial Statements. Each such delivery of financial statements will be accompanied by a certificate of the senior financial officer of Licensee certifying that no default on the part of Licensee under this Agreement has occurred, and certifying that all such statements have been prepared in accordance with generally accepted accounting principles and fairly present the financial position of Licensee at the end of such period reported therein and the results of operations and cash flows for the periods covered thereby. Licensor will have the opportunity to discuss all such financial statements and accompanying materials with Licensee, and Licensee and its accountants will provide Licensor with any such information Licensor reasonably requests in connection with this paragraph.

11.6     Licensee will prepare and deliver to Licensor at Licensee's sole cost and expense, a Business Plan for each Contract Year (and any updates thereof), together with such other information as Licensor may reasonably request with respect to Licensee's actual projected and proposed business in Licensed Merchandise for such Contract Year, no later than December 1 of the preceding Contract Year. Each Business Plan will be subject to Licensor's prior approval, which approval may not be unreasonably withheld or delayed and which shall be given or denied within twenty (20) business days of receipt of the Business Plan from Licensee. From time to time upon the request of Licensor, Licensee will furnish Licensor its quarterly sales projections for Approved Licensed Merchandise. Sales projections shall be accompanied by the assumptions on which such projections are based.

11.7     Licensee will make available to Licensor, upon request, any marketing plans, reports and information which Licensee may have from time to time with respect to Approved Licensed Merchandise.

11.8     Licensee will pay punctually and discharge when due, or renew or extend prior to default, in the ordinary course of business, any indebtedness heretofore or hereafter incurred by Licensee and discharge, perform and observe any covenants, provisions and conditions required to be discharged, performed and observed in connection therewith or in connection with any agreement relating thereto except (i) when such indebtedness is subject to a bona fide dispute; or (ii) with respect to indebtedness constituting in aggregate, less than Two Hundred Fifty Thousand Dollars and 00/100 ($250,000.00).

11.9     (a)      Licensee hereby covenants and agrees that it will, at all times during the Initial Term and any Renewal Term, be capitalized in such a manner sufficient to satisfy all of its obligations (financial and otherwise) under this Agreement.

(b)      Notwithstanding the foregoing, and without in any way limiting or restricting Licensor's right to terminate this Agreement upon default as hereinabove provided, which rights shall remain absolute, if Licensee's financial covenant set out in paragraph 11.9(a) hereof shall fail to be maintained, performed or observed, then and in such event the then current term of this Agreement will be deemed to terminate, without further notice or action on the part of any person, on the date which is four (4) months after

the first date on which such failure occurred, provided that any such failure is then continuing, unless Licensor shall, in its discretion, waive such termination, in writing, specifically referring to this paragraph.

(c) (i) Licensee, in order to induce Licensor to enter into this Agreement and to secure the full and complete payment and performance when due of all of Licensee's liabilities and obligations to Licensor hereunder, hereby pledges and grants to Licensor hereunder a first priority security interest in Licensee's rights and interests under the Agreement, whether such interests are now owned or in existence or hereafter acquired or created, together with all substitutions for, additions and accessions to, and proceeds (other than cash proceeds of any sale or transfer of this Agreement made in accordance with the terms hereof in excess of any unpaid obligations of Licensee hereunder, including, without limitation, the aggregate Guaranteed Minimum Royalties payable for the term of this Agreement) of the foregoing (the "Collateral").

(ii) Licensee at its sole cost and expense, shall execute and deliver any and all further documents, including, without limitation, Uniform Commercial Code financing statements and amendments and extensions thereof, and do any and all such further acts and supply any and all further information deemed necessary or desirable by Licensor to perfect, evidence, protect, maintain or enforce Licensor's security interest in the Collateral, or otherwise to carry out the purposes hereof, in any and all jurisdictions of the United States or elsewhere in the world. Licensor is hereby appointed attorney in fact of Licensee to execute and file, at any time and from time to time as Licensor may deem necessary or appropriate, one (1) or more financing statements, and any amendments and extensions thereof, signed only by Licensor, with respect to all or any part of the Collateral.

11.10 Licensee covenants and agrees it will not default on any of its significant loan agreements. Licensee will notify Licensor in writing immediately upon the earlier of (i) its receipt of any notice of default received from any significant lender or creditor of Licensee; or (ii) when it becomes aware that it is in default. Licensee will provide Licensor with authorization, on a quarterly basis, to communicate with Licensee's significant lenders and creditors regarding Licensee.

11.11 Licensee agrees that any loans by the principals or shareholders of Licensee to Licensee will be subordinated to Licensee's financial obligations under this agreement.

## 12. Effect of Expiration or Termination.

12.1 (a) Upon the expiration or termination of this Agreement (whether by reason of the expiration of the term of this Agreement, by earlier termination of this Agreement pursuant to Article 3 hereof or otherwise), except to the extent specifically otherwise provided in this Article 12, all rights of Licensee hereunder will terminate and revert automatically to Licensor, and neither Licensee nor any of its receivers, representatives, trustees, agents, successors or assigns (by operation of law or otherwise) will have any right to manufacture, exploit, advertise, merchandise, promote, sell, distribute or deal in or with Licensed Merchandise, and Licensee and all of its assignees, successors or assigns (by operation of law or otherwise) will forthwith discontinue all use of the Licensed Mark(s) and any derivation, component, variation or simulation thereof, or any mark confusingly similar therewith, and all references thereto or hereto, and all Merchandise Concepts, Design Concepts, Packaging, Merchandise, Intellectual Property, sketches, designs, colorways, Samples and labels provided or employed hereunder, including any modifications or improvements thereof, and any patents, trademarks, copyrights, trade names and other proprietary rights in connection therewith, all of which will revert to Licensor without any action by any Person and without any payment of consideration of

any kind to Licensee, and Licensee hereby irrevocably releases and disclaims any right or interest in or to any and all of the foregoing.

**(b)**    Licensee will, within twenty (20) days after the date either party notifies the other of its desire to terminate or not extend the Agreement (the *"Termination Notice"*) deliver to Licensor, separately for each Licensed Mark the following: (i) a complete list of Licensee's then current accounts for Licensed Merchandise and, for each account, Net Sales by Category for the last-completed Contract Year, indicating regular price and off-price sales; (ii) a list of each style, indicating total Net Sales dollars and units for the last-completed Contract Year, as well as Licensee's published list price and suggested retail price, if any; (iii) a list of the *"top 20"* selling styles for the last completed Contract Year, and two (2) samples of each. All information shall be stated separately with respect to each Licensed Mark and Category.   Contemporaneously with the delivery of such information Licensee will also deliver a complete and accurate schedule of Licensee's inventory of Licensed Merchandise and, to the extent available, related work in process and materials then on hand, in the possession of contractors and in transit including non-cancelable orders identifiable to Merchandise bearing the Licensed Mark(s) (hereinafter referred to as *"Inventory"*). The Inventory schedule shall be prepared as of the close of business on the date of such Termination Notice. Except as Licensor may otherwise agree, all cancelable orders for Licensed Merchandise and/or related materials shall promptly be canceled.

**(c)**    The provisions of this Section12.1 shall take precedence over any conflicting provision of this Agreement.  In addition, Licensee will execute any instruments requested by Licensor which Licensor, in its sole discretion, deems necessary, proper or appropriate to accomplish or confirm the foregoing. Any such assignment, transfer or conveyance shall be without consideration other than the mutual agreements contained herein.

**12.2**    If, upon the expiration or termination of this Agreement (whether by reason of the expiration of the stated term of this Agreement, by earlier termination of this Agreement pursuant to Article 3 hereof, or otherwise), Licensee (or any subcontractor, supplier or distributor of Licensee) has on hand any finished inventory of Licensed Merchandise *or* Promotion Products (or components thereof), Licensor will have the option (herein called the *"Inventory Purchase Option"*) to purchase all or any part of Licensee's (or any such subcontractor's, supplier's or distributor's) inventory (and any components thereof) of Approved Licensed Merchandise *or* Promotion Products which is completed and which remains on hand at such expiration or termination date and which is not subject to written orders received  from customers on the date of termination or expiration of this Agreement, for an aggregate purchase price equal to the lower of wholesale cost or market.  Any Licensed Merchandise on hand which does not constitute Approved Licensed Merchandise will be transferred to Licensor free of charge.  Such purchase will be f.o.b. point of shipment.  The Inventory Purchase Option may be exercised, in whole or in part, by Licensor within twenty (20) days after receipt by Licensor of Licensee's written statement referred to in Section 12.1 (*"Purchase Option Period"*), and the purchase price will be paid and inventory delivered within thirty (30) days after such exercise.  Licensor may offset the purchase price against any payment due from Licensee.  Upon termination of this Agreement, at the request of Licensor, Licensee will exercise its option under any then existing distributorship agreements to purchase inventory of Licensed Merchandise then held by such distributor.

**12.3**    Licensee may complete (but only in accordance with the terms and conditions of this Agreement) production of Approved Licensed Merchandise which is in process, or for which written orders have been received from customers, all as of the date of termination or expiration of this Agreement (whether by reason of the expiration of the stated term of this Agreement, by earlier termination of this Agreement

pursuant to Article 3 hereof or otherwise).  Notwithstanding anything to the contrary contained herein, upon completion of the production of any Licensed Merchandise in accordance with the provisions of this Article 12, such Approved Licensed Merchandise will be deemed subject to an Inventory Purchase Option, to the extent and as set forth in Section 12.2 hereof, except that (a) Licensee will present Licensor with a written list on the last day of each week during which it is completing such production, setting forth the Licensed Merchandise completed during such week; and (b) each applicable Purchase Option Period will commence upon Licensor's receipt of each such list.

      **12.4**    If and to the extent that the Inventory Purchase Option is not exercised in full with respect to all Licensed Merchandise subject thereto, and if Licensee is not in default under this Agreement, Licensee may use the Licensed Mark(s) (*"Royalty Option"*) in connection with the sale of Approved Licensed Merchandise as to which an Inventory Purchase Option was not exercised for the three (3) month period immediately following the expiration of the applicable Purchase Option Period, provided Licensee fully complies with the provisions of this Agreement in connection with such disposal.  Licensee will be obligated to continue to pay Licensor the Sales Royalty in respect of all of its sales of Licensed Merchandise made pursuant to the Royalty Option.  The existence of the Royalty Option shall not affect any of the rights of Licensor hereunder.  Upon the expiration of all Purchase Option Periods, or, if Licensee then has the Royalty Option, upon the expiration of the Royalty Option, Licensee will deliver to Licensor all material and other products in its possession or under its control incorporating the Licensed Mark(s), including all labels, tags, Packaging, containers, advertising and promotional material.

      **12.5**    Notwithstanding any termination or expiration of this Agreement (whether by reason of the expiration of the stated term of this Agreement, by earlier termination of this Agreement pursuant to Article 3 hereof or otherwise), Licensor will have, and hereby reserves, all the rights and remedies which it may have, at law or in equity, including with respect to (a) the collection of royalties or other funds payable by Licensee pursuant to this Agreement; (b) the enforcement of all rights relating to the establishment, maintenance and protection of the Licensed Mark(s); and (c) damages for breach of this Agreement on the part of Licensee.

      **12.6**    Notwithstanding anything to the contrary contained in this Agreement and subject to any right of first negotiation granted under Section 2.6, Licensor will have the right, exercisable at any time, to negotiate and enter into agreements with third parties either within the territory or outside the territory pursuant to which it may grant a license to use the Licensed Mark(s) in connection with the manufacture, advertising, promotion, distribution and sale of Merchandise outside the Territory.  Furthermore, Licensor will have the unrestricted right to manufacture, advertise, merchandise, promote, sell and distribute Licensed Merchandise, directly or through others, and to grant licenses with respect to Licensed Merchandise, in the Territory, at such time that Licensee fails to renew this Agreement in accordance with the terms hereof or notifies Licensor of its intention not to renew this Agreement, or at any time commencing twelve (12) months prior to the expiration or termination of the then-current term of this Agreement, except that in no event may Licensor or any third party licensee of Licensor ship for sale any Licensed Merchandise until after the effective date of the termination or expiration of this Agreement, and the first collection of Merchandise to be sold thereunder is the collection following the last seasonal collection sold hereunder.  Nothing contained herein will be construed to prevent any such third party licensee from showing such Licensed Merchandise and accepting orders therefore prior to the termination hereof.

13.   **Non-Compete.**

**13.1   (a)**   Licensee acknowledges that, in order to induce Licensor to enter into this Agreement and to grant Licensee the exclusive right, license and privilege to use the Licensed Mark(s) in connection with Approved Licensed Merchandise (all in accordance with the terms and subject to the conditions set forth in this Agreement), Licensee, among other things, has represented and warranted to Licensor that Licensee will devote a substantial portion of its time and energy and use all commercially reasonable efforts, through the adequate financing of Licensee's operations and business, in order that Licensee shall develop and maintain a substantial, permanent and expanding business in Approved Licensed Merchandise.   Licensee further acknowledges that Licensor is expressly relying on the representations and warranties of Licensee herein in entering into this Agreement and thereby granting to Licensee the exclusive license herein granted.   In order to confirm the scope and application of such representations and warranties, Licensee hereby covenants to and agrees with Licensor that, during the term of this Agreement, Licensee, its affiliates or subsidiaries, will not enter into, or solicit, initiate, encourage or participate in discussions or negotiations relating to, any business transaction or arrangement with respect to the manufacture, advertising, merchandising, promotion, sale or distribution of any Merchandise bearing or sold under or in association with the following brands (each a *"Competing Brand"*): Calvin Klein, CK, DKNY, Donna Karan, Michael Kors, Kors, Ralph Lauren and Lauren.

**(b)**   If Licensee contemplates entering into a license with a Competing Brand, Licensee will promptly inform Licensor and shall provide Licensor with sufficient information concerning the proposed transaction to enable Licensor to make an informed decision whether in its discretion, the nature of the proposed license or the parties participating therein would materially adversely impact upon or affect the Licensed Mark(s) or their use in connection with Licensed Merchandise or Licensee's ability to meet all of its obligations under this Agreement.   Licensor will notify Licensee of its decision within twenty (20) business days after it receives all of the information referred to in the preceding sentence or such other additional information as Licensor may reasonably request. If Licensor approves the proposed license, which approval must be in writing, and the advertising/exploitation commitments under such license are greater than that provided for hereunder, this Agreement will automatically be deemed to increase the aggregate of the Image Fund Payment and the minimum advertising obligations (as set forth in Section 7) and the Sales Royalty to the amounts provided in such license for comparable periods of time.   Licensee will notify Licensor promptly upon making any such other designer license agreement, including in such notice the identity of the designer and the advertising/exploitation commitment contained in said agreement.

14.   **Intellectual Property Matters.**

**14.1   (a)**   Licensor must approve in advance in writing all uses of the Licensed Mark(s). Licensee will not use a Licensed Mark(s) as part of a corporate name or as a trademark, servicemark or other commercial mark, in whole or in part, or in such a way so as to give the impression that the name of Licensor or LCI or the Licensed Mark(s), or any component, modification or variation of any of the foregoing, is the property of Licensee.   No name, names, word or words will be conjoined or used by Licensee in connection with the Licensed Mark(s) without the prior written consent of Licensor, including in any Packaging, advertising, promotional or business materials or the like utilized by Licensee in connection with Licensed Merchandise.

**14.2**   Licensee acknowledges that each Licensed Mark has acquired a valuable secondary meaning and goodwill in the minds of the trade and the public, and that all Merchandise bearing a Licensed

Mark has acquired a reputation of the highest quality and style.  Licensee acknowledges that Licensor is the owner of all right, title and interest in and to each Licensed Mark in any and all forms or embodiments thereof, and is the owner of the goodwill attached to each Licensed Mark in connection with the business and goods in relation to which the same has been and may in the future be used.  For the purposes of trademark registration, sales by Licensee of Licensed Merchandise shall be deemed to have been made by and for the benefit of Licensor.  Licensee will exercise its commercially reasonable efforts throughout its operations under this Agreement to safeguard the prestige and goodwill of the Licensed Mark(s).  Licensee will not, at any time, do or suffer to be done any act or thing which may, in any way, impair the rights of Licensor in and, or which may affect the validity or depreciate the value of, the Licensed Mark(s) or their respective prestige or goodwill.

      **14.3**    Licensee acknowledges that only Licensor may, at its own expense, file and prosecute a trademark application or applications to register a Licensed Mark or any component, derivation or variation thereof, for any items or services, including Licensed Merchandise.

      **14.4**    Licensee will use the Licensed Mark(s) strictly in compliance with and observance of any and all applicable laws, rules, regulations, and ordinances and will use such markings in connection therewith as may be reasonably requested by Licensor.  To the extent any rights in and to a Licensed Mark are deemed to accrue to Licensee pursuant to this Agreement or otherwise, Licensee hereby assigns any and all such rights, at such time as they may be deemed to accrue, to Licensor.  Licensee will execute any and all documents and instruments reasonably requested by Licensor which Licensor may deem necessary, proper or appropriate to accomplish or confirm the foregoing.  Any such assignment, transfer or conveyance will be without consideration other than the mutual agreements contained herein.  Upon expiration or termination of this Agreement for any reason whatsoever, Licensee will forthwith execute and file any and all documents reasonably requested by Licensor terminating any and all trademark registrations, registered user agreements and other documents regarding the Licensed Mark(s).  Licensor shall bear all expenses reasonably incurred in preparing and recording any and all such documents.

      **14.5**    Licensee agrees, on behalf of itself, its affiliates and owners, never (i) to challenge the validity or ownership of any Licensed Mark or any application for registration thereof, or the trademark registrations thereof, in any jurisdiction; nor (ii) to contest the fact that Licensee's rights under this Agreement are (a) solely those of a manufacturer and distributor; and (b) terminate upon termination of this Agreement subject only to the applicable provisions of Sections 12.2 and 12.3 hereof.  The provisions of this Section 1,4.5 will survive any termination or expiration of the term of this Agreement.

      **14.6**    Licensee and Licensor agree and intend that all created works of authorship including, but not limited to such works comprising or included in Licensed Merchandise, advertising, packaging, and Merchandise IP (as defined in Paragraph 14.8), created by Licensee or other persons or entities and used with the Licensed Mark(s), are Works Made For Hire within the meaning of the United States Copyright Act of 1976 and shall be the property of Licensor who shall be entitled to use and license others to use such works of authorship.  To the extent such works of authorship are not Works Made For Hire as defined by the United States Copyright Act of 1976, Licensee shall assign to Licensor copyright in such works of authorship, and Licensee irrevocably appoints Licensor as its attorney-in-fact to execute such documents if Licensee fails to return executed copies of such documents to Licensor within five (5) days following submission.  Licensee waives all moral rights in works of authorship created pursuant to this Agreement.

      **14.7**    Licensee will promptly notify Licensor of any infringement of the Licensed Mark(s), or any act of unfair competition by third parties relating to a Licensed Mark, whenever such infringement or act comes to Licensee's attention.  After receipt of such notice from Licensee, Licensor may, in Licensor's

discretion, take such action to stop such infringement or act as Licensor may deem necessary to protect the Licensed Mark(s).  Licensee will cooperate fully with Licensor to stop any such infringement or act and, if so requested by Licensor, will join with Licensor as a party to any action brought by Licensor for such purpose. Licensor will have full control over any action taken, including the right to select counsel, to settle on any terms it deems advisable in its discretion, to appeal any adverse decision rendered in any court, to discontinue any action taken by it, and otherwise to make any decision in respect thereto as it in its discretion deems advisable.  Licensor will bear all expenses connected with the foregoing, except that if Licensee desires to retain its own counsel, it may do so at its own expense.  Any recovery as a result of such action will belong solely to Licensor.  Licensee agrees that Licensor will have the sole power to take or omit to take legal or other action, before any court or governmental authority or otherwise, with respect to the protection of the Licensed Mark(s) against infringement or otherwise, and that if Licensor determines, in its discretion, that it would not be in the best interests of Licensor's business, viewed as a whole, to take any such action, Licensor may determine to omit from taking any such action, and Licensee hereby agrees to abide by any such decision.

       **14.8**    Licensee hereby represents, warrants and covenants that Licensee will own or obtain, for the sole benefit of Licensor, prior to any use thereof, any and all rights in or to any designs, sketches, or components thereof, Packaging, advertising and artwork (such concepts and materials are collectively referred to as the *"Merchandise IP"*) necessary or appropriate to enable Licensee to (a) manufacture and sell Approved Licensed Merchandise based on or embodying such Merchandise IP, free and clear of any third party claims of infringement; and (b) prevent others from manufacturing and selling Merchandise based on or embodying such Merchandise IP or any element confusingly similar thereto.  All right, title and interest in and to all Samples (including Final Samples), and all Merchandise IP used in connection with all Samples and Merchandise derived therefrom, including any modifications to or improvements of any of the foregoing, to the extent the same may for any reason be deemed to be other than the sole and exclusive property of Licensor, are hereby assigned to, and will be the sole and exclusive property of, Licensor, and will not be used by Licensee other than in strict accordance with this Agreement.  All Merchandise manufactured by Licensee, Samples (including Final Samples), Merchandise Concepts, Design Concepts, sketches, product designs and colorways provided hereunder will be used by Licensee only in accordance with this Agreement, and none of the foregoing which are unique to Licensed Merchandise will be used or adapted by or through Licensee, through any affiliate of Licensee or otherwise, to produce any items or products other than Approved Licensed Merchandise hereunder.

       **14.9**    Licensee represents and warrants that any trademarks (other than the Licensed Mark(s)) ("Secondary Marks") recommended by Licensee for use with Licensed Merchandise will not infringe any third party trademarks, trade dress, copyrights, or other related rights.  Licensor will have the sole right, but no obligation, to file trademark applications to register any such Secondary Marks.  For the avoidance of any doubt, Secondary Marks are not included within the definition of Licensed Mark(s) in this Agreement including the reference thereto in Paragraph 17.2.

       **14.10**    Intentionally omitted.

**15.**    <u>Confidentiality</u>.

       **15.1**    Each party acknowledges that all information of a business or technical nature imparted to the other party during the course of this Agreement with respect to the business of the disclosing party and its affiliates, including business plans, designs, sketches, materials, colors, costs, pricing, customers, production techniques, sources of supply and other documents, non-public information and trade secrets, were acquired, designed and/or developed by them at great expense, are secret, confidential and unique, and

constitute the trade secrets and exclusive property of the disclosing party and its affiliates, and that any use by the other party of any such trade secrets and property, other than for the sole purpose of manufacturing, advertising, merchandising, promoting, selling and distributing Approved Licensed Merchandise in accordance with the terms of this Agreement, would be wrongful and would cause irreparable injury to the disclosing party and its affiliates.

   15.2  Neither party will at any time disclose or divulge to any Person, or use or suffer the use by any other Person, for any purpose other than solely as required for the manufacturing, advertising, merchandising, promoting, selling and distributing of Approved Licensed Merchandise in accordance with the terms of this Agreement, directly or indirectly, for its own or the benefit of any Person, any property, trade secrets or confidential information of the other party or any of its affiliates obtained from or through them.

   15.3  Licensor may use and authorize its affiliates and others to use, in any manner Licensor desires, any design components provided or approved by Licensor for use by Licensee hereunder, whether or not distinctive and whether or not they are actually used by Licensee hereunder, provided that such use does not conflict with any rights granted to Licensee hereunder.  No such use by Licensor, its affiliates or others outside the Territory or in connection with products other than Merchandise will be deemed in conflict with any rights granted to Licensee hereunder.

  **16.**  **Equitable Relief.** Each party acknowledges that the other will suffer great and irreparable harm as a result of the breach of any covenant or agreement to be performed or observed under this Agreement other than the covenants to make monetary payments, and, whether such breach occurs before or after the termination of this Agreement, each party acknowledges that the non-breaching party will be entitled to apply for and receive from any court of competent jurisdiction a temporary restraining order, preliminary injunction and permanent injunction, without any necessity of proving damages or any requirement for the posting of a bond or other security, enjoining the breaching party from further breach of this Agreement or further infringement or impairment of Licensor's rights in and to the Licensed Mark(s).  Such relief will be in addition to and not in substitution of any other remedies available to the non-breaching party pursuant to this Agreement or otherwise.

  **17.**  **Indemnity; Insurance.**

   17.1  (a)  It is understood and agreed that as between Licensor, on the one hand, and Licensee, on the other hand, Licensor assumes no liability to Licensee or any third party with respect to the performance characteristics of Licensed Merchandise, all of which liabilities will be borne by Licensee.

     (b)  Licensee agrees to indemnify and hold Licensor, LCI and their respective officers, directors, agents, representatives and controlling persons (collectively, for purposes of this Section 16(b), *"Licensor"*), individually, harmless from any and all liability, claims, causes of action, suits, damages and expenses (including reasonable attorneys' fees and expenses) (collectively, *"Indemnified Losses"*), which Licensor may become liable for, or may incur, or be compelled to pay, by reason of any acts, whether of omission or commission, that may arise under or in connection with this Agreement, in connection with Licensed Merchandise manufactured by or on behalf of Licensee or otherwise in connection with Licensee's business or by virtue of any misrepresentation or breach of warranty or failure to perform or observe any covenant on its part to be performed or observed hereunder.

   17.2  Licensor agrees to indemnify and hold Licensee and its officers, directors, agents, representatives and controlling persons (collectively, for purposes of this Section 17.2, *"Licensee"*) harmless

from any and all Indemnified Losses, which Licensee may become liable for, or may incur, or be compelled to pay, solely and directly as a result of the infringement of the trademark rights of a third party unaffiliated with Licensee solely by reason of Licensee's use of the Licensed Mark(s) within the Territory, in accordance with the terms and conditions of this Agreement.

      17.3    An indemnified party will immediately give notice to the indemnifying party of any claim, action or suit that may give rise to liability under this Article 17, provided that the failure of any indemnified party to provide such notice will not relieve the indemnifying party of its obligations hereunder. The indemnifying party will have the option to defend any such claim, action or suit, including the right to select counsel, control the defense, assert counterclaims and crossclaims, bond any lien or judgment, take any appeal and to settle on such terms as it, in its discretion, reasonably deems advisable, provided prior notice of any settlement is given to the indemnified party and such party provides its express prior consent thereto. No settlement of any claim may be effected without the prior written consent of the indemnifying party.

      17.4    Licensee will maintain in full force and effect at all times during which Licensed Merchandise is being sold and used, with a recognized and responsible insurance carrier reasonably acceptable to Licensor, a liability insurance policy with limits of liability of at least the amounts set forth in Schedule 17.4. Liability coverage under such insurance policy will include claims resulting from accidents or occurrences arising out of any alleged defect in Licensed Merchandise, whether such defect be patent or latent in nature and whether such defect is alleged to be a manufacturing or design defect. Such insurance will insure against all accidents or occurrences occurring at all times during which Licensed Merchandise is being sold and used, regardless of when the claim is made. Such insurance will be for the benefit of and will name as additional insureds Licensor, LCI and their respective officers, directors, agents, representatives and controlling persons, shall provide for at least thirty (30) days' prior written notice by the carrier thereof to Licensor and Licensee of the cancellation or modification thereof, and must be obtained from an insurance company with an A.M. Best rating of A-, VII or better. Licensee will as promptly as practicable, after the date hereof and from time to time thereafter upon Licensor's written request, deliver to Licensor a certificate of such insurance from the insurance carrier which sets forth the scope of coverage and the limits of liability. Licensee will provide Licensor as promptly as practicable with a true, correct and complete copy of any Insurance Notice received by Licensee hereunder. In the event that the insurance coverage to be provided under the policy as proposed to be modified by any Insurance Notice shall be unacceptable to Licensor, Licensee will thereupon use all commercially reasonable efforts either to retain the coverage then provided for in the said policy or to obtain other insurance coverage which is acceptable to Licensor. In the event that, within fifteen (15) days prior to the effective date of any change set out in any Insurance Notice, Licensee will not have provided or arranged for insurance coverage (substitute or otherwise) acceptable to Licensor, Licensor may itself arrange to obtain insurance coverage complying with the terms hereof. Licensee will reimburse Licensor, immediately upon Licensor's request, for all expenses and premium payments associated with Licensor's seeking and obtaining such coverage. Licensee's maintenance of the insurance coverage as provided herein will not limit, excuse or replace any of Licensee's obligations under the provisions of Section 16.1 hereof, which will remain absolute. Any such insurance may be obtained by Licensee in conjunction with a currently existing policy covering other products.

      17.5    The provisions of this Article 17 will survive any termination or expiration of this Agreement.

18.    <u>**Representations and Warranties.**</u>

      18.1    Licensee hereby represents and warrants to Licensor as follows:

27

(a)     Licensee is a corporation duly organized, validly existing and in good standing under the laws of the state of incorporation as set forth on page 1 of this Agreement, and is duly qualified and authorized to do business and in good standing in all jurisdictions in which the nature of its business requires such qualifications.

(b)     Neither the execution, delivery nor performance of this Agreement by Licensee will, with or without the giving of notice or passage of time, or both, conflict with, or result in a default or loss of rights under, any provision of any other agreement or understanding to which Licensee is a party or by which it or any of its properties may be bound.

(c)     Licensee has full power and authority to enter into this Agreement and to carry out the transactions contemplated thereby in accordance with its terms; the execution, delivery, and performance of this Agreement by Licensee have been duly and properly authorized by all necessary actions; and this Agreement constitutes the valid and binding obligation of Licensee enforceable in accordance with its terms.

18.2    Licensor hereby represents and warrants to Licensee as follows:

(a)     Licensor is a corporation duly organized, validly existing and in good standing under the laws of Delaware, and is duly qualified and authorized to do business as a foreign corporation in good standing in all jurisdictions in which the nature of its business requires such qualification.

(b)     Neither the execution, delivery nor performance of this Agreement by Licensor will, with or without the giving of notice or passage of time, or both, conflict with, or result in a default or loss of rights under, any provision of the Certificate of Incorporation or By-Laws of Licensor or any other agreement or understanding to which Licensor is a party or by which it or any of its properties may be bound.

(c)     Licensor has full power and authority to enter into this Agreement and to carry out the transactions contemplated thereby in accordance with its terms; the execution, delivery, and performance of this Agreement by Licensor have been duly and properly authorized by all necessary corporate actions; and this Agreement constitutes the valid and binding obligation of Licensor enforceable in accordance with its terms.

(d)     Licensor has the right to grant the license to use the Licensed Mark(s) as trademarks in connection with the manufacturing, advertising, promotions, sales and distribution of Approved Licensed Merchandise by Licensee, as contemplated by and under the terms and conditions set forth in this Agreement.

19.     **Brokers.**  Each of Licensor and Licensee hereby represents and warrants to the other that neither it nor any of its affiliates (including its officers, directors or employees) has employed or dealt with any broker or finder in connection with this Agreement or the transactions contemplated hereby, and agrees to indemnify and hold the other party and its affiliates harmless from any and all liabilities (including, without limitation, reasonable attorneys' fees and disbursements paid or incurred in connection with any such liabilities) for any brokerage commissions or finders' fees in connection with this Agreement or the transactions contemplated hereby insofar as such liabilities shall be based on the arrangements or agreements made by it or on its behalf.